Margot **NEWMARK**, Appellee,

v.

**RKO GENERAL, INC.**, Appellant,

and

**Frontier Airlines, Inc.**, Defendant.

**No. 612, Docket 34345.**

United States Court of Appeals, Second Circuit.

Argued April 2, 1970.

Decided April 30, 1970.

Marvin Schwartz, New York City (David L. McLean, Sullivan & Cromwell, and Regan, Goldfarb, Powell & Quinn, New York City, on the brief), for appellant.

Stanley L. Kaufman, New York City (Shephard S. Miller, Allan K. Peckel, and Kaufman, Taylor, Kimmel & Miller, New York City, on the brief), for appellee.

Before KAUFMAN and FEINBERG, Circuit Judges, and PALMIERI, District Judge.*

IRVING R. KAUFMAN, Circuit Judge:

Section 16(b) of the Securities Exchange Act of 1934 is one of several provisions of the federal securities laws designed to deter insiders from trading on the basis of information unavailable to the general public.[1] Commonly termed "a crude rule of thumb," the statute seeks to prevent insiders from realizing profits on securities held for short periods of time.[2] It is not aimed solely at

---

* Of the Southern District of New York, sitting by designation.

1. The statute reads:

 For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This section shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

2. The description, "a crude rule of thumb," was first employed by Mr. Thomas Corcoran, spokesman for the drafters of the statute, during congressional hearings on the bill which ultimately became section

the actuality of evil, or the veritable employment of inside information for purely speculative purposes, but also at potentiality for evil inherent in all insider short-swing trading.

To maximize its deterrent effect, the section is drafted in clear, straightforward terms. It provides that whenever a director, officer or owner of ten percent or more of any class of an issuer's securities purchases and sells equity securities of that issuer within a six-month period, he must return any profits he realizes to the issuer. There are no other prerequisites or postulates to liability. The purpose and reach of the statute, it was thought, would be clear, and litigation seldom necessary.

The complexities of the commercial and financial world, however, have defied the draftsmen's efforts at neat classification. Whether certain "unorthodox" transactions, well illustrated here by the exchanges of securities incident to a merger which form the basis of this appeal, are "purchases" or "sales" for the purposes of section 16(b) cannot be resolved by mere reference to the words of the statute. In such cases, the determination of the statute's relevance must rest, initially, on whether there exists the potential for evil against which the statute was intended to guard. Blau v. Lamb, 363 F.2d 507 (2d Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967). Only when an opportunity for speculative abuse is present is it necessary to determine whether the transactions alleged to give rise to 16 (b) liability may fairly be characterized as insider purchases and sales.

## I. FACTS

The facts are undisputed. In April 1967, the managements of Frontier Airlines, Inc. and Central Airlines, Inc. reached a provisional agreement to merge their companies by an exchange of stock. Defendant RKO controlled Frontier at that time through its ownership of 56% of the company's outstanding common stock. On May 3 or 4, 1967, RKO contracted with several major Central shareholders to purchase, at $8.50 per share, 738,251 shares of Central common (representing 49% of Central's outstanding shares), and $500,000 of Central debentures convertible into an additional 149,994 shares. The parties do not dispute that these debentures were "equity" securities. The formal merger agreement, providing for the exchange of 3½ shares of Central common for each share of Frontier common, was executed on May 4. The first disclosure of the agreements to the public and minority shareholders of both corporations occurred the following day.

Shareholder approval of the proposed merger was foreordained, for the terms of the purchase contract obliged the majority shareholders of both corporations to vote their shares in favor of the proposal.[3] The Central shareholders were

16(b). Hearings Before Senate Committee on Banking & Currency, 73d Cong., 2d Sess. 6557 (1934). The phrase now serves to describe not only the statute but also one approach to its application. Under the "objective" or "rule of thumb" approach, the statute is applied to all transactions which seem to fall within its terms, without regard to whether imposition of liability would further the purposes of the statute. See, e. g., Heli-Coil Corp. v. Webster, 352 F.2d 156 (3d Cir. 1965). We have rejected this interpretation, see Blau v. Lamb, 363 F.2d 507 (2d Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967), in favor of the more "pragmatic" approach of applying the statute only to those situations subject to speculative manipulation. For a comparative analysis of the two approaches to application of the statute, which concludes that this Circuit's rule is preferable, see Note, Stock Exchanges Pursuant to Corporate Consolidation: A Section 16(b) "Purchase or Sale"?, 117 U.Pa.L.Rev. 1035 (1969).

3. Paragraph 2(b) of the purchase contract required the sellers, owners of 66% of Central's voting shares, to cause "Central to take all necessary corporate action to approve and authorize the merger with Frontier (including the approval thereof by Central's stockholders)"; similarly,

also required to manage their corporation in a manner which would not prejudice RKO. Since two airlines were involved, consummation of the merger was conditioned on approval by the CAB. The task of processing the merger through the CAB apparently fell upon RKO; accordingly, its subsidiary Frontier was afforded full access to the books and records of Central. If, in RKO's "good faith judgment," the subsidy awarded the surviving corporation by the CAB was inadequate, or any of the other conditions imposed by the CAB adversely affected the interests of any of the parties, the contract granted RKO the right to abandon the agreements. An additional provision conditioned the merger on the consent of certain Central creditors and their waiver of Central's loan defaults.

As anticipated, the majority shareholders of the two companies voted their endorsement on July 27. On the same day, the Frontier shareholders authorized a two-for-one stock split. The exchange rate in the merger agreement was accordingly adjusted to 3½ Central shares for each two shares of Frontier. Less than a week later, on August 2, the CAB added its imprimatur by approving RKO's purchase of the Central stock and the merger agreement. After Frontier, the surviving corporation, signified its satisfaction with the amount of the subsidy to the new airline and the other conditions imposed upon the merger by the CAB, the

CAB's order of approval became final on September 1. During the ensuing weeks, Central's creditors, seemingly as a matter of course, agreed to waive Central's loan defaults.

On September 18, the purchase agreement was executed; RKO paid the contract price of $8,550,082.50 and received in return the Central shares and debentures. That same day the parties filed the merger agreement with the Secretary of State of Nevada, the state of incorporation of both Frontier and Central. The physical exchange of Central certificates for Frontier certificates, at the rate embodied in the merger agreement, occurred on October 1.

Plaintiff Newmark, an owner of Frontier debentures and warrants since April 1967, instituted this action in the Southern District of New York in December 1967.[4] After both parties moved for summary judgment on the undisputed facts we have recited, Judge Tyler granted Newmark's cross-motion for summary judgment on the issue of liability. A trial on the issue of damages followed; at its conclusion Judge Bonsal awarded damages in the amount of $7,920,681. The award was based upon the difference between the purchase price of the Central shares and debentures and the market price of their equivalent in Frontier shares on the date of the merger, to which sum Judge Bonsal added a control premium of 15%.

paragraph 5(c) required RKO, owner of 56% of Frontier's voting shares, to cause "Frontier to take all necessary corporate action to approve and authorize the merger with Central * * * including voting the stock of Frontier owned by RKO in favor of such merger."

4. On this appeal, RKO raises for the first time a belated challenge to the plaintiff's standing to maintain this action. The statute authorizes "the owner of any security of the issuer," in this case Central, to institute an action on behalf of the issuer. Relying on a literal reading of the statute, RKO argues that plaintiff's ownership of Frontier securities is irrelevant and that since she never owned Central shares she does not have standing to bring

this action. This argument is without merit. Central no longer exists. Any cause of action it may have had now belongs to Frontier, the company into which it merged. Any recovery will redound to Frontier's benefit. Those most interested in securing this recovery are the holders of Frontier's securities, and they are the proper parties to bring an action for its benefit. Blau v. Oppenheim, 250 F.Supp. 881 (S.D.N.Y.1966). Moreover, RKO did not raise Newmark's alleged lack of capacity to sue in the district court; its present attempt to raise this defense for the first time would appear untimely. Fed.R.Civ. 9(a), 12(b); C. Wright, Federal Courts 280 (2d ed. 1970).

## II. POTENTIAL FOR SPECULATIVE ABUSE

The threshold issue raised on this appeal is whether the purchase and subsequent exchange of Central shares lent itself to the type of speculative abuse which section 16(b) was designed to prevent. Blau v. Lehman, 286 F.2d 786 (2d Cir. 1960), aff'd, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962); Park & Tilford, Inc. v. Schulte, 160 F.2d 984 (2d Cir.), cert. denied, 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347 (1947). That RKO's heart may have been pure and its motivation noble matters not. The significant factor is whether RKO *could have* reaped a speculative profit from the "unfair use of information * * * obtained * * * by reason of [its] relationship to [Central]." Securities Exchange Act of 1934, § 16(b) 15 U.S.C. § 78p(b).

RKO's contract to purchase Central shares is a classic example of trading while in the possession of information unavailable to the general public. On May 3 or 4, 1967, RKO secured a contractual right, conditioned on CAB approval of a related merger, to purchase Central common shares for $8.50 per share. Because of its control of Frontier and consequent involvement in the merger negotiations between Frontier and Central, RKO had full knowledge of the proposed merger at the time it signed this contract. Release thereafter of the proposed merger agreement to the public caused a predictable rise in the price of the securities of both airlines. RKO was in an ideal position to take speculative advantage of this rise by purchasing Central securities at a price established in the purchase agreement before public disclosure of the proposed merger and disposing of these securities after disclosure had caused them to increase in value.

In an effort to establish the absence of an opportunity for speculative manipulation, RKO emphasizes the connection between the prices of Frontier and Central shares during the period subsequent to the release of the merger agreement to the public. It argues that whatever the absolute price of Frontier common may have been at various times during this period, it tended to remain approximately 3½ times greater than the price of Central common, the ratio set forth in the merger agreement. Thus, RKO says, it was impossible to profit from an exchange of Central shares for Frontier shares. This argument would have some merit if RKO had possessed no more than an option to purchase a quantity of Central shares at an unspecified price, but on the facts before us, it is no more than a red herring. RKO possessed an option to purchase, not at the market price on the day of purchase, but at the fixed price of $8.50 per share. Accordingly, the constant ratio between the prices of Central shares and Frontier shares did not preclude the realization of speculative profits; rather, the fluctuating ratio between the prices of the shares of both companies and the previously established purchase price of $8.50 per share made these gains possible.

Moreover, the potential for speculative abuse did not end with the fixing of the purchase price for Central shares prior to the release of the news of the proposed merger to the public. Under the terms of the merger and purchase agreements, RKO secured several advantages. It not only acquired knowledge of what would transpire but also could exercise substantial influence over the course of events. Once the CAB had granted its initial approval on August 2, RKO had the power to determine when or, for that matter, if the purchase and merger would take place. RKO had no obligation to purchase the Central shares unless, in its "good faith judgment," the subsidy granted the merged airline by the CAB was satisfactory. It was thus in a position to maximize its speculative gain in Central shares by withholding its expression of satisfaction with the subsidy until the rise in the price of both Central and Frontier shares fully reflected the impending merger. At the same time, it should be clear that RKO's power to reject the subsidy would have

enabled it to escape any possible loss in Central securities. If, for some unexpected reason, the contemplated rise in the price of Central and Frontier shares had not followed the public announcement of the proposed merger, RKO could easily have avoided the entire transaction without incurring any legal liability. The purchase and merger agreements placed RKO in a position which must be the dream of every speculator—"Heads I win, tails I do not lose."

■ In sum, the purchase and subsequent exchange of Central shares were fraught with opportunities for the kind of speculative abuse section 16(b) was intended to abort. RKO's success in fixing the purchase price before the proposed merger became public knowledge opened the door to possible speculative gains. Its ability to determine whether and when the merger would be consummated enabled it to maximize these gains or, at the very least, to avoid any loss.

## III. STATUTORY REQUIREMENTS

Having disposed of the threshold question and determined that the purchase and exchange of Central shares presented opportunities for the type of speculative evil against which section 16(b) was intended to guard, we must now decide whether RKO's transactions in Central common stock fall within the scope of the statutory provisions. Before liability can attach under 16(b) there must be (1) a purchase and (2) a sale of securities (3) by one who owns more than 10 percent of any one class of the issuer's securities (4) within a six-month period.

### A. *Purchase and Holding Period*

As to two of the four elements, there can be little dispute. Since all of the events relevant to this appeal transpired within a six-month span during the year 1967, any purchase and sale which formed a part of these events occurred within the statutory period. Similarly, by any rational definition, RKO's exchange of $7,550,082.50 in cash for Central's common stock and convertible debentures was a "purchase" of those securities.

### B. *Sale*

Whether the subsequent exchange of Central shares for Frontier shares pursuant to the merger agreement constituted a "sale" of the Central securities for purposes of section 16(b) poses a somewhat more difficult problem. RKO contends that the exchange did not fundamentally alter the nature of its holdings and therefore that it cannot fairly be characterized as a sale. Before the exchange, RKO urges, it owned a block of shares in each of the two separate companies; later, it was the owner of an equivalent block in the company remaining after the merger. This argument, in essence, urges us to invoke the "economic equivalence" test of Blau v. Lamb, *supra*, where we held that the conversion of preferred stock to common stock was not a sale under 16(b) since "that which the insider [surrendered] and that which he [received were] simply different forms of the same participation in his issuer." 363 F.2d at 523. RKO's reliance on Blau v. Lamb, however, is misplaced. The doctrine of economic equivalence is applicable only to exchanges involving the securities of a single issuer; we stated clearly that "sales or purchases by an insider of his issuer's securities for cash, *the securities of a different company*, or other property are within the reach of Section 16(b) * * *." 363 F.2d at 523 (emphasis added). When RKO exchanged its Central shares for Frontier securities it received "the securities of a different issuer," which represented ownership rights in the new merged airline. The "economic equivalence" exemption established by Blau v. Lamb is, thus, inapplicable to this case. See Blau v. Mission Corp., 212 F.2d 77 (2d Cir.), cert. denied, Mission Corp. v. Blau, 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138 (1954).

■ The connection between the purchase of Central shares and the merger of Central and Frontier provides additional support for the view that the exchange of securities was a sufficiently meaningful event, in view of the circumstances present here, to be considered a

sale. We note that RKO concedes, indeed argues strenuously, that the purchase and merger were interdependent, that the completion of each transaction was conditioned upon the consummation of the other. Given the interdependence of the purchase and the merger, it cannot be urged that RKO could simply have purchased Central securities at the contract price and sold them at a price inflated by the announcement of the impending merger. It is clear in this case, that only through the exchange provided for in the merger agreement could RKO have realized a speculative profit in Central shares.[5]

■ Alternatively, RKO urges us to decide that even if the exchange was a sale, it failed to realize any profit on the transaction, and, accordingly, plaintiff was entitled to no recovery. This argument rests almost entirely on the decision in Heli-Coil Corp. v. Webster, 352 F.2d 156 (3d Cir. 1965), which held there were no profits realized in a conversion of securities, the rationale being that realization would occur only when the securities received in the conversion were sold for cash. The purpose of the statute, it seems to us, is quite clearly inconsistent with this narrow interpretation of "profits realized."[6] The salutary objective of section 16(b) is to prevent an insider from investing in the securities of his issuer, holding them briefly, and then divesting himself of his investment at a tidy profit. Whether, upon divestment, the insider receives cash or property should be immaterial; if the statute is to achieve its end what is significant is that he has attempted to turn a short swing in the price of his issuer's securities to his own personal advantage. RKO purchased Central securities for some 7.5 million dollars. In return for these securities, it received Frontier shares worth more than 15 million dollars. The receipt of these shares was a sufficient realization of profit to place the transaction within the scope of section 16(b). See Blau v. Mission Corp., 212 F.2d 77 (2d Cir.), cert. denied, 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138 (1954); Blau v. Lamb, 363 F.2d 507, 523 (2d Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967).

### C. Beneficial Ownership

■ The final statutory provision required to be fulfilled before section 16 (b) liability may be imposed on RKO is that it must have been a Central insider, in this case a ten percent beneficial owner, at the time it purchased and sold Central securities. Since RKO engaged in only a single purchase of Central securities, we are presented with the question whether the prohibition of section 16(b) embraces the very transaction

---

5. As a result of RKO's holding in Frontier, it was a "person controlling an air carrier," and its acquisition of a controlling block of the shares of another air carrier, Central, required CAB appoval. Federal Aviation Act, § 408(a) (5), 49 U.S.C. § 1378(a) (5). As stated above, the CAB granted its approval of the proposed acquisition, but did so on the assumption that the purchase would be followed by a merger which it found to be "consistent with the public interest." The CAB did not rule that the purchase would be permissible if it were not accompanied by the merger. Therefore, RKO would have violated the CAB's order had it purchased the Central securities, backed out of the merger, and disposed of the securities in return for cash. Under the terms of the agency's order, RKO was required to exchange the Central securities it purchased for Frontier securities pursuant to the merger agreement.

6. In Blau v. Lamb, we expressly declined to follow Heli-Coil's treatment of the "purchase and sale" issue under section 16 (b); we also refuse to follow the restrictive interpretation of "realization of profits" advanced in that case. In Heli-Coil, the Third Circuit was employing the "objective" approach to the applicability of section 16(b). See note 2 supra. It may well be that the narrow definition of "profits realized" was an attempt to avoid the harsh results which often follow from the "objective" approach, as opposed to this Court's "pragmatic" approach. See Hemmer, Insider Liability for Short-Swing Profits Pursuant to Mergers and Related Transactions, 22 Vand.L.Rev. 1101 (1969).

which makes one a ten percent beneficial owner. Our decision in Stella v. Graham-Paige Motors Corp., 232 F.2d 299 (2d Cir.), cert. denied, 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52 (1956), makes it clear that the statute is applicable to such a transaction. See 2 L.Loss, Securities Regulation 1060 (1961). This rule is grounded on the frequently cited overriding purpose of the statute, deterrence of insider trading on the basis of information unavailable to the investing public. The statutory reference to a ten percent beneficial owner rests on the presumption that an owner of this quantity of securities has access to inside information.[7] Although this presumption would not justify the conclusion that one who purchases a quantity of shares which makes him a ten percent beneficial owner has done so on the basis of inside information, the presumed access to such information resulting from this purchase provides him with an opportunity, not available to the investing public, to sell his shares at the moment most advantageous to him. Thus, a purchase of shares which makes the buyer an insider creates an opportunity for the type of speculative abuse the statute was enacted to prevent.

 Moreover, on the facts before us, we have no difficulty in deciding that RKO became a beneficial owner of more than ten percent of Central's common stock before its purchase of Central shares on September 18. On May 3 or 4, 1967, RKO entered into an agreement which granted it a conditional right to purchase more than 50% of Central's common stock at a fixed price, ensured that Central would be managed in accordance with its interests, and required a majority of Central shares to be voted in support of a merger it favored. This contract, we conclude, granted rights of ownership, particularly those rights most important to the speculative purchaser, so substantial as to make RKO a ten percent beneficial owner of Central at that time. Contrary to the assertions of RKO, this conclusion is in no way inconsistent with our decision in Stella v. Graham-Paige Motors Corp., supra, that the holder of an option is not an insider until he has made a commitment to exercise the option.[8]

Stella rested on the assumption that "one who holds an unexercised option is not usually in a position to obtain [advance] information from the company," 232 F.2d at 301, an assumption of no validity in the case before us. At the time it secured a conditional right to purchase Central securities, RKO was in possession of advance information of the type most likely to affect the price of Central shares—confidential knowledge of an impending merger with Frontier.

Accordingly, we conclude that RKO became a Central insider, purchased Central securities and, less than six months later, sold these securities. The district court properly required RKO to return the profits it realized on this sale to Frontier, Central's successor in interest.

## IV. DAMAGES

### A. *Central Debentures*

Judge Bonsal's determination of the amount of profits realized by RKO and, consequently, his award of damages to the plaintiff were based on the conclusion that the merger had constituted a sale not only of the Central common stock

7. Since the stated purpose of the statute is to prevent the unfair use of information which insiders may have obtained by reason of their relationship to the issuer, the reason for including ten percent beneficial owners within the definition of insiders must have been the determination that the owner of a quantity of stock that large is likely to be privy to such information. *See* 2 L. Loss, Securities Regulation 1060–61 (1961) (ten percent beneficial owner presumed to have access to inside information).

8. Blau v. Ogsbury, 210 F.2d 426 (2d Cir. 1954), a second case cited by RKO in support of the proposition that it cannot be deemed to have been a Central insider before its purchase of Central shares, is inapposite. In that case we were called upon to decide when a buyer actually purchased shares, not when he became a beneficial owner.

purchased by RKO but also of the Central debentures. These debentures, as we have indicated, were convertible into 149,994 shares of Central common stock. The court's award of damages included a sum derived from the difference between the price RKO paid for the debentures and the value of the Frontier shares for which 149,994 shares of Central could have been exchanged pursuant to the merger agreement. RKO, urging that the court erred in awarding this sum as damages, points out that it neither converted the debentures into Central common stock before the merger nor converted these securities into Frontier stock after the merger. Without such a conversion, it argues, there could not have been any sale of the debentures and, hence, any profit realized.

■ Although this argument has surface appeal, RKO's contention distorts the nature of the transactions in which it engaged. RKO did not purchase the debentures because of their value as debt securities but because of their easy convertibility into Central common stock. The purchase price of $1,274,949 bore no relation to the debentures' face value of $500,000; rather, it was dependent upon the number of Central shares into which the debentures could be converted and the purchase price of $8.50 for each of such shares. Pursuant to section 7(b) of the merger agreement, the debentures became convertible into Frontier shares upon the consummation of the merger. Thus, although there was no physical exchange of certificates, the merger resulted in the exchange of the right to purchase Central shares represented by the debentures for the right to purchase the shares of Frontier. It is this right to purchase, rather than the debt characteristics of the debentures, which was important to RKO.[9] The district judge was therefore entirely correct in characterizing this transaction as a sale and awarding as damages the profits realized thereon.

## B. *Control Premium*

RKO has no quarrel with the method the district court employed for the calculation of damages. The basic award of damages was the difference between the price RKO paid for its Central securities and the market value, on the date of the merger, of the Frontier securities RKO received in return for its holdings in Central. To this basic sum, however, the district judge added a control premium of 15 percent. The addition of this control premium, RKO contends, was erroneous.

■ We are of the view that the inclusion of a control premium in the damage award was justified. Cf. Blau v. Lamb, 242 F.Supp. 151 (S.D.N.Y.1965), rev'd in part on other grounds, 363 F.2d 507 (2d Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967), noted in 5 L.Loss, Securities Regulation 3041 (1969); Fistel v. Christman, 135 F.Supp. 830 (S.D.N.Y. 1955), noted in 2 L.Loss, Securities Regulation 1073–74 (1961). It is elementary that RKO could not have retained legal control of Frontier without the block of Frontier shares it received in exchange for its Central securities. At the trial on the issue of damages, Dr. Bellemore, a securities expert, provided extensive testimony concerning the value of attaining legal control. The district court thus had before it evidence that this block of Frontier shares had a special value to RKO which it would not have had to any other investor. Moreover, there was evidence that previous purchases of large quantities of Frontier shares which had conferred control on the purchaser had been at a substantial premium, ranging from 15% to 26%.[10] In view of all the

---

9. It is interesting to note, that, throughout the purchase agreement, the Central stock and debentures were characterized collectively as "the Stock."

10. To support the contention that it would not have been willing to pay a premium in order to retain its legal control over Frontier in this instance, RKO points to the contractual purchase price for Central shares, which was below, rather than above, the market price. This evidence is

evidence which the district judge considered, we cannot characterize as clearly erroneous his finding that the block of shares RKO received in exchange for its Central securities was 15 percent more valuable to it that to the average investor in the marketplace.

Affirmed.

not convincing. It does not show, or even strongly suggest, that RKO would not have been willing to pay a premium had it been forced to do so. Indeed, the prior purchases of large blocks of Frontier shares suggest that it would have been willing to do so.