984 F.2d 1328
 Fed. Sec. L. Rep. P 97,333
Eli FRANKEL, Plaintiff-Appellant,
v.
Donald SLOTKIN, Carl H. Lindner, Louis A. Guzzetti, Jr.,
Keith E. Lindner, S. Craig Lindner, David H. Lubetzky, Jean
H. Sisco, Ronald F. Walker, Jay Wells, American Financial
Corporation, FMI Financial Corporation, United Brands Co.,
Defendants-Appellees.
 No. 499, Docket 92-7678.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 20, 1992.
Decided Jan. 25, 1993.
 
 Irving Malchman, New York City (Kaufman, Malchman, Kaufmann & Kirby, of counsel), for plaintiff-appellant.
 Jay G. Strum, New York City (Peter M. Fishbein, Michael A. Lynn, Michael K. Rozen, Kaye, Scholer, Fierman, Hays & Handler, of counsel), for defendants-appellees.
 Before: PRATT, ALTIMARI, Circuit Judges, and GERALD W. HEANEY, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.
 HEANEY, Senior Circuit Judge:
 
 
 1
 Eli Frankel, a minority shareholder of United Brands Company (UB), brought a shareholder derivative suit on behalf of UB against the directors of UB and two other corporations, alleging securities fraud under both federal and state law. The district court dismissed two of Frankel's claims prior to discovery and granted summary judgment to the defendants on the others following discovery. We affirm, but for reasons other than those advanced by the district court.
 
 I. BACKGROUND
 A. The Facts
 
 2
 On March 8, 1985, UB publicly announced a twenty-day lowering of the conversion rate on its 5 1/2% convertible subordinated debentures due February 1, 1994, from $55 per share to $21.50 per share. The temporary reduction brought the conversion rate into line with the market value of the common stock by allowing conversion to common stock for about $13.33 per share while the stock had been trading at $13 to $14.25 per share. The announcement stated that American Financial Corporation (AFC), which owned 49.6% of the outstanding voting stock of UB and $29 million of the convertible debentures, intended to convert all of its debentures into common stock. The announcement also disclosed that Carl Lindner was chairman of the board of both UB and AFC, and that three additional AFC executive officers served on the board of UB. Fifty-three million dollars' worth of the outstanding $105 million of debentures were converted into common stock during the temporary reduction.
 
 
 3
 On May 7, 1985, AFC purchased 2,500 shares of UB stock on the open market for $13.71 per share. On May 21, 1985, FMI Financial Corporation (FMI) purchased 1.1 million shares of UB stock on the open market for $15.18 per share. Lindner and his family own 100% of AFC, which in turn beneficially owns 65.1% of FMI stock. Forty-five days later FMI made a tender offer for up to 4.5 million shares of UB stock at $20 per share. At that time, AFC owned approximately 54% of outstanding UB stock and FMI owned approximately 7.3% of UB stock. App. at 137. In connection with the tender offer, AFC granted FMI the right to require AFC to purchase the shares acquired by the offer at a price of $18 per share.
 
 
 4
 Throughout the above events, UB's board of directors consisted of nine members, all of whom are defendants in this action.[1] Three of the directors are Lindners: Carl H. Lindner, Chairman and Chief Executive Officer of UB and a director of FMI; Carl's son Keith E. Lindner, also a Vice President of UB, and a director and Executive Vice President of FMI; and Carl's son S. Craig Lindner, also a director of FMI. A fourth director, Ronald F. Walker, was President and Chief Operating Officer of both UB and AFC as well as being a director of AFC. The other five directors (Louis A. Guzzetti, David H. Lubetzky, Donald Slotkin, Jean H. Sisco, and Jay Wells) are referred to throughout as the "independent" directors because under New Jersey law they were allowed to vote on the board's response to the tender offer by FMI, the other four being prevented by conflicts of interest. The five independent directors of UB voted to take no position on the tender offer. FMI then acquired 3.8 million shares of UB stock, which increased the amount of UB common stock controlled by AFC from 61.3% to 85.8%.
 
 B. The Complaint and Its History
 
 5
 Frankel originally filed this action in September 1985 in the United States District Court for the Eastern District of New York, asserting four bases of relief: (1) violation of section 10(b) of the Securities Exchange Act of 1934 (the Act), 15 U.S.C. § 78j(b) (1982), and Securities Exchange Commission (SEC) rule 10b-5, 17 C.F.R. § 240.10b-5 (1985); (2) violation of section 14(e) of the Act, 15 U.S.C. § 78n(e) (1982), and SEC rule 14e-3, 17 C.F.R. § 240.14e-3 (1985); (3) violation of section 16(b) of the Act, 15 U.S.C. § 78p(b) (1982); and (4) violation of the common law fiduciary duty of corporate officers to the corporation. Frankel framed the action as a shareholder derivative suit on behalf of the corporation and alleged that the defendants aided, abetted, and conspired in the claimed violations.
 
 
 6
 On defendants' motion, the court dismissed the complaint in August 1986 with leave to refile. After an amended complaint was filed in October 1986, defendants again moved to dismiss. The court dismissed plaintiff's claims under rule 14(e) and section 16(b), but denied defendants' motion with respect to the rule 10b-5 claim and the pendent common law claim. Frankel v. Slotkin, 705 F.Supp. 105 (E.D.N.Y.1989). A subsequent summary judgment motion against the remaining claims was denied prior to discovery. Following discovery, defendants renewed their motion for summary judgment, asserting that there was no evidence to suggest that defendants were planning the tender offer at the time of the debenture conversion. The court denied the motion, but later entertained a successive motion for summary judgment on the grounds that the defendants had no inside information at the time of the debenture conversion. On its own initiative, the court then requested "papers from the parties clarifying what injury, if any, United Brands as opposed to its shareholders suffered for which plaintiff can recover on behalf of the corporation." Frankel v. Slotkin, No. 85-C-3385 (E.D.N.Y. dated Feb. 3, 1992). After the requested papers were filed, the court granted summary judgment for the defendants on the two remaining claims. It found no injury to UB that would allow a derivative suit on its behalf for violation of section 10(b) and rule 10b-5 and found that "the New Jersey courts would not recognize a duplicative claim under common law for recovery of profits from insiders." Frankel v. Slotkin, 795 F.Supp. 76, 81 (E.D.N.Y.1992).
 
 
 7
 Frankel appeals the disposition of three of his claims, those based on SEC rule 10b-5, New Jersey common law, and section 16(b) of the Act. We examine each of these in turn.
 
 
 8
 II. THE CLAIM UNDER SECTION 10(b) AND RULE 10B-5
 
 
 9
 Frankel asserts that the debenture conversion violated section 10(b) of the Act and rule 10b-5. He appears to argue along two distinct lines: first, that by causing UB to omit information of FMI's future tender offer in the announcement of the debenture conversion, AFC--and those defendants who aided, abetted, and conspired with AFC--violated rule 10b-5, see Amended Complaint pp 70-72; and second, that AFC and the others violated rule 10b-5 by trading on misappropriated inside information that belonged to UB--namely, that FMI's tender offer would not be opposed by UB. See Amended Complaint pp 14, 18.[2]
 
 A. The Injury
 
 10
 Without noting the distinction between the two theories of liability under rule 10b-5, the district court raised the question of what harm to the corporation had occurred that would support a shareholder derivative action on its behalf. Frankel responded that the corporation was harmed by issuing too many shares for the converted debentures; that as the shares were worth more than the $13-14 per share for which they were trading at the time because of the impending tender offer at $20 per share, UB should have set the conversion rate higher to account for the actual value of the shares, and as it did not, it was harmed by the "sale" of its stock to AFC through the debenture conversion at an unfair bargain price.
 
 
 11
 The district court correctly indicated that for the plaintiff to maintain a derivative action for damages under rule 10b-5 he must show damage to the corporation by the fraud as required by section 28(a) of the Act, 15 U.S.C. § 78bb(a) (1982). See Pelletier v. Stuart-James Co., 863 F.2d 1550, 1557-58 (11th Cir.1989); William Z. Salcer, Panfeld, Edelman v. Envicon Equities Corp., 744 F.2d 935, 939-40 (2d Cir.1984), cert. granted and judgment vacated on other grounds, 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986). The court found that the plaintiff had made no such showing, for "if United Brands issued too many shares in the transaction, it was the minority shareholders who conceivably were injured by the dilution of their interests. The corporate entity United Brands, which paid out no money in the transaction, suffered no direct economic injury." Frankel, 795 F.Supp. at 79.
 
 
 12
 Were liability under rule 10b-5 limited to injury that resulted from the alleged material omission in UB's announcement of the debenture conversion, we would agree with the district court's conclusion. There is no evidence that UB was injured simply by its failure to include information on FMI's future tender offer in its announcement of the debenture conversion.
 
 
 13
 Liability is not limited to injury from the alleged material omission, however, for Frankel argues that UB was harmed by AFC's allegedly trading on misappropriated inside information. If Frankel can show that AFC misappropriated from UB the knowledge that FMI's future tender offer would not be opposed by the independent directors, UB would then be harmed by having received less than fair value for the treasury stock it issued to AFC in the debenture conversion. We find that a series of this court's previous decisions support a finding of injury to the corporation when it issues its own securities for less than fair value due to deception on the part of the purchaser.
 
 
 14
 Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir.1964), was a shareholder derivative action dismissed by the district court for lack of subject matter jurisdiction in part because it found that the issuance of stock by a corporation was not a "sale" within the meaning of section 10(b) of the Act or rule 10b-5. This court reversed, stating that
 
 
 15
 [a]s a matter of authority and principle, the issuance by a corporation of its own shares is a 'sale' to which the anti-fraud policy expressed in the federal securities laws extends.... "Considering the purpose of this legislation, it would be unrealistic to say that a corporation having the capacity to acquire $700,000 worth of assets for its 700,000 shares of stock has suffered no loss if what it gave was $700,000 but what it got was zero. If--as we very much doubt--accountants would support any such contention as a consequence of the esoteric mysteries of the double entry system, the law with its eye on reality would have to part company with such purists."
 
 
 16
 Id. at 27 (citations omitted) (quoting Hooper v. Mountain States Secs. Corp., 282 F.2d 195, 203 (5th Cir.1960) (citation omitted), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961)).
 
 
 17
 Beyond simply finding that the corporation itself could sue, the Ruckle court found a suit by the corporation preferable to suits by individual shareholders because such suits "would either run afoul of privity requirements ... or result in smaller recoveries based on loss to individual investments, which would also be difficult to compute." Id. at 28 (citation omitted).
 
 
 18
 The full court took up similar issues in Schoenbaum v. Firstbrook, 405 F.2d 215 (2d Cir.1968) (en banc), cert. denied, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). In that case, plaintiff brought a shareholder derivative action on behalf of Banff Oil Ltd. against the majority shareholder, Aquitaine Co., which had arranged for Banff to issue it 500,000 shares of stock at what was then market price while arguably in possession of the inside information that through exploratory drilling Banff had literally struck oil. Citing Ruckle, the Schoenbaum court stated not only that the "issuance by Banff of its stock to Aquitaine was a sale of securities within the meaning of Section 10(b) and Rule 10b-5,"[3] but that "[t]he stockholders of Banff may bring a derivative action for damages to the corporation suffered by reason of a violation of Section 10(b) and Rule 10b-5." Id. at 219. The court was aware that "Aquitaine and the directors of Banff were guilty of deceiving the stockholders of Banff (other than Aquitaine)," id. at 220, but it held that a derivative action was appropriate, not leaving the remedy to suit by minority stockholders on their own behalf.
 
 
 19
 Goldberg v. Meridor, 567 F.2d 209 (2d Cir.1977), cert. denied, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978), another shareholder derivative suit under section 10(b) and rule 10b-5, rounds out the analysis. An issue presented in that case was whether the Supreme Court's decision in Santa Fe Indus. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), had affected the holding in Schoenbaum. This court found that Green left much of Schoenbaum intact:
 
 
 20
 Schoenbaum, then, can rest solidly on the now widely recognized ground that there is deception of the corporation (in effect, of its minority shareholders) when the corporation is influenced by its controlling shareholder to engage in a transaction adverse to the corporation's interests (in effect, the minority shareholders' interests) and there is nondisclosure or misleading disclosures [sic] as to the material facts of the transaction.... [W]e do not read Green as ruling that no action lies under Rule 10b-5 when a controlling corporation causes a partly owned subsidiary to sell its securities to the parent in a fraudulent transaction and fails to make a disclosure or, as can be alleged here, makes a misleading disclosure.
 
 
 21
 Goldberg, 567 F.2d at 217-18.
 
 
 22
 The district court in the instant case found that "[t]he analysis in the Goldberg opinion relates to the meaning of 'deception,' and does not address the question whether the Section 10(b) claim was properly brought in a derivative action," stating further that "[t]he court does not interpret that case to find an identity of interest between the minority shareholders and the corporation such that an injury to one, the minority shareholders, is equivalent to an injury to the other, the corporation." Frankel, 795 F.Supp. at 79. The district court found that the only harm to result from the debenture conversion was a dilution of the minority shareholders' interest in the corporation, and that that did not support a derivative action on the corporation's behalf. We need not address the question of identity of interest, for as this court has held in Ruckle and Schoenbaum, a corporation is injured when it is fraudulently induced into issuing its own securities for less than their fair value because of misappropriation of inside information. Though a corporation's minority shareholders are also injured by dilution of their interests in the corporation, the corporation itself as seller of its own securities suffers an independent injury sufficient to support an action for damages, derivative or otherwise, under section 10(b) and rule 10b-5.
 
 B. The Claim of Misappropriation
 
 23
 Our analysis of Frankel's 10b-5 claim does not end with a finding of injury to the corporation. The defendants correctly argue that we can affirm the judgment of the district court on any ground that appears in the record below. See University Club v. City of New York, 842 F.2d 37, 39 (2d Cir.1988); Arlinghaus v. Ritenour, 622 F.2d 629, 638-39 (2d Cir.), cert. denied, 449 U.S. 1013, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980). They further argue that we should affirm on either of the bases argued in their two post-discovery motions for summary judgment: first, that none of the defendants had any knowledge of, or had anticipated in any way, the July tender offer at the time of the debenture conversion in March; and second, that even had the Lindners and AFC known of FMI's forthcoming tender offer, there is no evidence to indicate that they had the alleged inside information, i.e., that UB's independent directors would not oppose the tender offer. Defendants' first argument was rejected by the district court in its denial of their first post-discovery summary judgment motion--and we find no error in that ruling--but the second argument was not addressed by the district court due to its ruling on the issue of injury to the corporation. We now address that argument.[4]
 
 
 24
 As presented, Frankel's 10b-5 claim turns on AFC, and those defendants who aided and abetted AFC, having knowledge not only that FMI would make a future tender offer, but that UB would not oppose that tender offer. Absent the specific knowledge that the offer would be unopposed, there would be no misappropriation of inside information belonging to UB.
 
 
 25
 Defendants rely primarily on Frankel's answers to several interrogatories from May 1991. Frankel then alleged that of the five independent directors, only Guzzetti had been informed of the impending tender offer. App. at 399.[5] He made no allegation that any of the independent directors informed AFC how they would respond to such a tender offer. Id. at 400. When asked what precisely had been communicated to Guzzetti, Frankel's assertion left no room for discretion on the part of the independent directors. He alleged that Guzzetti was told "[t]hat FMI Financial Corporation would make a friendly and unopposed tender offer for United Brands stock." Id. at 399 (emphasis added). Frankel appears to assume that which he must show, for if there was evidence that Lindner (and AFC) had control of the votes of the independent directors, it would be unnecessary for him to communicate anything to the directors regarding the future tender offer. But as no such control has been shown, Frankel then assumes the burden of showing how Lindner and AFC knew that UB's independent directors would not oppose the tender offer.
 
 
 26
 On appeal, Frankel states three bases for his argument that the defendants knew that the tender offer would be unopposed: first, three of the five independent directors held executive positions with UB or its subsidiaries; second, UB cooperated with FMI to facilitate FMI's tender offer prior to UB's board meeting; and third, Dennis Doyle, UB's general counsel and attorney for AFC, instructed the independent directors how to respond to the tender offer.
 
 
 27
 In substance, then, we must determine whether a jury could reasonably find that the defendants knew the July tender offer would be unopposed at the time of the March debenture conversion.
 
 
 28
 In the fact finding process a trier is authorized to draw reasonable inferences from known or proven facts. But the inference, to qualify as a fact found, must be reasonable, and, in the context of the known facts, be one that springs readily and logically to mind and is not one of two or more inferences, both or all of which are about equally probable.
 
 
 29
 NLRB v. Martin A. Gleason, Inc., 534 F.2d 466, 474 (2d Cir.1976); see also Radiation Dynamics, Inc. v. Goldmuntz, 464 F.2d 876, 887 (2d Cir.1972) (" '[p]ermissible inferences must still be within the range of reasonable probability ... and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture' " (quoting Ford Motor Co. v. McDavid, 259 F.2d 261, 266 (4th Cir.), cert. denied, 358 U.S. 908, 79 S.Ct. 234, 3 L.Ed.2d 229 (1958))).
 
 
 30
 Frankel insists that because three of the five independent directors are employed by UB or its subsidiaries, and because UB is controlled by Lindner, a jury could reasonably find that the defendants knew that a tender offer from FMI would be unopposed. The defendants argue that a jury could not reasonably infer that the votes of the three directors were controlled by Lindner simply because they were employed by a corporation (or its subsidiaries) that was under his control.[6] We agree. A jury could not reasonably find that AFC possessed knowledge in March that FMI's July tender offer would not be opposed by UB simply because three of the five directors eligible to vote on it were employed by UB or its subsidiaries.[7]
 
 
 31
 Frankel offers two other arguments, but neither is persuasive. He argues that UB cooperated with FMI prior to the announcement of the tender offer by providing FMI with a shareholder list. Defendants reply that such action simply avoids needless litigation, and that as a five-percent shareholder, FMI is entitled to a shareholder list on demand under New Jersey law. N.J.Stat.Ann. § 14A:5-28 (Supp.1984); see also Delmarmo Assoc. v. New Jersey Eng'g & Supply Co., 177 N.J.Super. 15, 424 A.2d 847, 848 (1980). Frankel further argues that the actions of Dennis Doyle, general counsel to UB and attorney to AFC, in advising UB's board of directors of their obligation to respond to FMI's tender offer and in drafting a proposed response, which was partially adopted by the board,[8] provide evidence that the defendants knew in advance that the independent directors would not oppose the tender offer. We find that a jury could not reasonably infer from these events--which took place two to three months following the debenture conversion--that the defendants knew at the time of the debenture conversion that the June tender offer would not be opposed.
 
 
 32
 Given that Frankel has presented no evidence from which a jury could reasonably find, either directly or by inference, that the defendants possessed the information that the independent board members would not oppose the impending tender offer at the time of the debenture conversion, we affirm the grant of summary judgment for the defendants on the misappropriation claim under rule 10b-5 on this basis.[9]
 
 III. THE CLAIM UNDER NEW JERSEY COMMON LAW
 
 33
 Frankel also alleges that FMI's open-market purchase of 1.1 million shares of UB stock on May 21, 1985, violated New Jersey common law.[10] According to Frankel, New Jersey law allows a corporation to recover profits from a fiduciary, such as a director, who trades in the corporation's stock on inside information. The district court held that New Jersey would not recognize such a cause of action, and therefore granted summary judgment for the defendants. All parties agree, however, that the district court failed to consider decisions by the United States District Court of New Jersey, which has held that New Jersey would recognize such a cause of action. See National Westminster Bancorp NJ v. Leone, 702 F.Supp. 1132, 1139 (D.N.J.1988); In re ORFA Secs. Litig., 654 F.Supp. 1449, 1455 (D.N.J.1987).
 
 
 34
 Both parties further agree that ORFA is "the best indication of New Jersey law on this issue." Appellees' Brief at 19; see Appellant's Brief at 19. We therefore begin our analysis with ORFA, in which the court held that New Jersey would recognize "a common law right of action for a derivative plaintiff against a corporate officer who has traded stock of the corporation on the basis of inside information," ORFA, 654 F.Supp. at 1453, but went on to indicate that "[b]reach of fiduciary obligation is a tort claim, and thus requires the showing of a duty, a breach, an injury, and causation." Id. at 1457 (emphasis added).
 
 
 35
 Frankel relies heavily on the ORFA court's statement that the question of harm will be taken up at trial. Id. at 1457-58; see also National Westminster, 702 F.Supp. at 1139. Frankel fails to note, however, that the ORFA court faced a motion to dismiss early in the proceedings. Here we face the second post-discovery summary judgment motion on an action that has been in the courts for seven years. But in National Westminster the court also faced a summary judgment motion, though it too occurred early in the proceedings. Given that we review this case after the third motion for summary judgment and after nearly seven years of proceedings, we find that by this stage in the proceedings, a plaintiff must present affirmative evidence from which a jury could reasonably infer injury on the part of the corporation on whose behalf the action is brought.
 
 
 36
 Frankel asserts that a "jury could find harm to UB here because this case involves a plan or scheme by [the defendants] to acquire absolute control of UB," Appellant's Reply Brief at 5, adding that the debenture conversion is part of the "unitary scheme." Id. This assertion of injury is insufficient to survive summary judgment. The question is not injury from the debenture conversion, but from the open-market stock purchase by FMI. The assertion that the defendants sought to obtain control of UB is, without more, insufficient as well, particularly because there is little dispute that Carl Lindner controlled UB prior to any of the transactions at issue, as indicated by statements in his and AFC's public filings with the SEC in 1984 and 1985 in which they state that they "may be deemed to be 'controlling persons' of UB." App. at 159, 170.
 
 
 37
 As Frankel has failed to provide any evidence from which a jury could reasonably infer injury to UB by FMI's open-market stock purchase, we affirm the district court's grant of summary judgment to the defendants on that ground.
 
 IV. THE SECTION 16(b) CLAIM
 
 38
 The final issue on appeal is Frankel's claim under section 16(b) of the Act, which
 
 
 39
 seeks to prevent insiders from realizing profits on securities held for short periods of time. It is not aimed solely at the actuality of evil, or the veritable employment of inside information for purely speculative purposes, but also at potentiality for evil inherent in all insider short-swing trading.
 
 
 40
 To maximize its deterrent effect, the section is drafted in clear, straightforward terms. It provides that whenever a director, officer or owner of ten percent or more of any class of an issuer's securities purchases and sells equity securities of that issuer within a six-month period, he must return any profits he realizes to the issuer. There are no other pre-requisites or postulates to liability....
 
 
 41
 Newmark v. RKO General, Inc., 425 F.2d 348, 350-51 (2d Cir.) (footnotes omitted), cert. denied, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970).
 
 
 42
 Frankel bases his section 16(b) claim on FMI's open-market purchase of 1.1 million shares of UB stock on May 21, 1985, followed by AFC's grant to FMI on July 3, 1985, of an absolute and unconditional right to require AFC to purchase the 3.8 million shares of UB stock acquired by FMI through its tender offer at the price of $18 per share (the "put"). This put was exercisable by FMI during the month of July in each of the years 1986-88, which indicates that it could not be exercised for at least one year after the completion of the tender offer. As the shares are fungible, Frankel argues that the put constituted a sale of the 1.1 million shares FMI had acquired at $15.18 per share, resulting in a short-swing profit of $2.72 per share. The district court dismissed this claim prior to discovery, finding that the grant of a put does not constitute a sale under section 16(b). Frankel v. Slotkin, 705 F.Supp. 105, 109 (E.D.N.Y.1989).
 
 
 43
 Defendants argue, and the district court agreed, that it is the law of this circuit that it is the exercise, and not the acquisition, of a put that constitutes a sale under section 16(b). See Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 601, 93 S.Ct. 1736, 1748, 36 L.Ed.2d 503 (1973); Silverman v. Landa, 306 F.2d 422, 424-25 (2d Cir.1962). Frankel argues that those cases did not involve an optionee as this case does, but the district court was correctly unpersuaded because "[t]hat argument fails to address the central issue, namely, whether the put was a 'purchase and sale' within the meaning of § 16(b)." Frankel, 705 F.Supp. at 109.
 
 
 44
 Frankel's second argument rests on the SEC's new rules under section 16(b) that now consider the acquisition of a put or call to be a purchase and sale for the purposes of determining short-swing profits. See 17 C.F.R. 240.16b-6 (1992). Though the new rules were not effective until May 1991 and therefore are not directly applicable to this case, Frankel argues that the rationale behind the new rules, that the receipt of a put is the functional equivalent of a sale, mandates the application of section 16(b) to the transactions in this case. Defendants respond that on releasing the new rules, the SEC noted that this was a reversal on its part:
 
 
 45
 In realigning the section 16(b) focus from the exercise of the derivative securities to the acquisition of the derivative securities, the new regulatory framework not only reverses the Commission's own regulatory approach but also differs from a line of cases that, in the absence of rules to the contrary, have held that the exercise of the option (rather than its acquisition) is the section 16(b) purchase of an equity security.
 
 
 46
 Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 28,869, 56 Fed.Reg. 7242, 7250 (Feb. 21, 1991). The SEC release specifically cited this court's Silverman decision as one of the cases its new rules would reverse. Id. at n. 116. Given that the new rule is a reversal, and that the law of this circuit has been to consider only the exercise of an option a purchase or sale within section 16(b), the district court correctly dismissed Frankel's claim, and we affirm.
 
 V. CONCLUSION
 
 47
 Frankel has failed to provide evidence from which a jury could reasonably infer that the defendants traded on inside information. We therefore affirm the district court's grant of summary judgment for the defendants on the claims of securities law violations under rule 10b-5. Frankel further failed to provide evidence from which a jury could reasonably infer that FMI's open-market stock purchase injured UB, and we therefore also affirm the district court's grant of summary judgment for the defendants on the New Jersey common law claim. As the put in question did not constitute a sale under section 16(b) in this circuit prior to May 1991, we also affirm the district court's dismissal of Frankel's claim for short-swing profits.
 
 
 
 [1]
 For ease of description, we will use "defendants" henceforth to refer to all of the defendant-appellees except UB. See Fed.R.App.P. 28(d)
 
 
 [2]
 At no point does Frankel asserts that AFC or FMI had a duty to disclose any information that they might have possessed regarding their own plans for acquisition of UB stock independent of the allegation that they possessed inside information that UB would cooperate with the tender offer. We therefore do not address whether AFC or FMI had a duty to disclose their own plans regarding acquisition of UB stock regardless of how those plans were to be received by UB
 
 
 [3]
 Though it has not been suggested that the debenture conversion was not a "sale" for purposes of section 10(b), we nonetheless will make that point explicit: the issuance of treasury stock by UB in exchange for outstanding debentures is a "sale" of securities by UB. See 5B Arnold S. Jacobs, Litigation and Practice Under Rule 10b-5 § 38.02[b], at 2-131 (1992)
 
 
 [4]
 We note initially that this issue was briefed by plaintiff and defendants in both the district court and our court, creating a sufficient record for decision
 
 
 [5]
 This assertion by Frankel appears designed to support his claim that Guzzetti purchased 40,000 shares of UB stock in early May 1985 while in possession of inside information. See Amended Complaint p 49. Despite his assertion in the answer to defendants' interrogatory, Frankel provides no affirmative evidence on this point. In any event, a jury could not reasonably infer that Guzzetti had knowledge of the tender offer in March simply from these assertions
 We further note that Frankel makes no claim for relief against Guzzetti for his acquisition of UB stock. See Amended Complaint pp 69-92 (stating four claims for relief, none of which mentions Guzzetti's stock acquisition).
 
 
 [6]
 Of the five directors, two (Sisco and Wells) were directors of UB prior to any involvement by Lindner with the company. It is the other three whom Frankel argues could be expected to vote in Lindner's interest because they were employed by UB or its subsidiaries. Defendants argue that even Frankel's premise is flawed, for Lubetzky did not stand for reelection in 1985 because UB had sold the subsidiary of which he was Chief Executive Officer. Consequently, he was in no way reliant on Lindner for his employment or remuneration
 
 
 [7]
 This holding finds support in a ruling by this court involving the futility exception to the demand requirement under Fed.R.Civ.P. 23.1. In Kaster v. Modification Sys., Inc., 731 F.2d 1014, 1019 (2d Cir.1984), this court held that a plaintiff could not simply assert futility of demand because the board was controlled by the alleged wrongdoer. In that context, we refused to accept the argument that "ownership of a majority of the voting shares of a corporation allows the majority shareholder to choose the members of the board of directors who in turn will protect the interests of that shareholder to secure their board positions," stating that such argument "does not always reflect the realities of corporate life." Id. at 1020. In the same context, the Third Circuit stated, "Certainly, there is no presumption that a director is controlled. Rather, the issue is an intensely factual one. Consequently, there is no reason why a plaintiff cannot assert the facts from which it is believed an inference of control could be drawn." Vernars v. Young, 539 F.2d 966, 968 (3d Cir.1976). We agree that the issue is intensely factual, but when faced with no facts beyond simple employment by either UB or a subsidiary, we find that the plaintiff has not met his burden
 
 
 [8]
 In advising the independent directors on their obligation under the Securities Exchange Act of 1934 to respond to FMI's tender offer, Doyle submitted a proposed response in which the board took no position on the tender offer. The board appears to have used this as a starting point for its discussions, accepting certain paragraphs and sentences, but adding its own as well. The following excerpts from UB's response appear to have been taken verbatim from Doyle's draft response:
 Based on the voluntary nature of the Offer and the fact that AFC is the principal shareholder of both UB and FMI, UB expresses no opinion and remains neutral with respect to the Offer.
 Accordingly, UB believes that a determination to accept or reject the Offer should be made by each of UB's Shareholders based upon such Shareholder's investment needs and objectives and only after a thorough review of the Offer. UB has made no attempt to evaluate the financial fairness of the offering price.
 App. at 433.
 
 
 [9]
 The district court also ruled that the corporation was not injured by FMI's open-market purchase of 1.1 million UB shares on May 21, 1985, and therefore dismissed that claim under rule 10b-5 as well. As defendants indicate, Frankel makes no claim regarding that transaction under rule 10b-5, so we do not address that ruling by the district court. See Amended Complaint pp 69-73 (stating claim for relief under rule 10b-5)
 
 
 [10]
 The parties do not dispute that New Jersey state law controls this issue because UB is a New Jersey corporation. See Treadway Cos. v. Care Corp., 638 F.2d 357, 375 (2d Cir.1980) (applying New Jersey law to a New Jersey corporation)