USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1405 ESTATE OF JAIME SOLER, Plaintiffs, Appellants, v. JOAQUIN RODRIGUEZ, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Jose Antonio Fuste, U.S. District Judge] ___________________ ____________________ Before Boudin, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Boyle,1 Senior District Judge.  _____________________ ____________________ Pedro A. Jimenez, with whom Katarina Stipec Rubio and _________________ _______________________ Gonz lez Oliver, Correa Calzada, Collazo Salazar, Herrero & _________________________________________________________________ Jim nez were on brief for appellants. _______ Jorge E. P rez D az, with whom Jorge I. Peirats and ______________________ __________________ Pietrantoni Mendez & Alvarez were on brief for appellee Centro _____________________________ Medico Del Turabo, Inc.  Eli B. Arroyo for appellee Universidad de Ciencias Medicas _____________ San Juan Bautista, Inc. ____________________ August 15, 1995 ____________________  ____________________ 1Of the District of Rhode Island, sitting by designation. CAMPBELL, Senior Circuit Judge. In this ________________________ shareholder's derivative suit brought on behalf of Centro M dico del Turabo, Inc. ("CMT"), Plaintiffs-Appellants Ivette Perez Vda. de Soler, Marie Ivette Soler Perez, Jaime A. Soler Perez, and Antonio Soler Perez (as representatives of the Estate of Dr. Jaime Soler, or the "Soler Estate") and Dr. Jose A. Badillo appeal from the district court's Opinion and Order and Order on Reconsideration dismissing their verified complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.1 Estate of Soler ________________ ex rel. Soler v. Rodriguez, 847 F. Supp. 236 (D.P.R. 1994). _____________ _________  ____________________ 1. In its Opinion and Order and Order on Reconsideration, the district court said it was dismissing the complaint for failure to state a claim under Rule 12(b)(6), but stated in the judgment that the complaint was dismissed for lack of subject matter jurisdiction. Where both federal jurisdiction and the existence of a federal claim turn upon whether the complaint states a federal question, the preferable practice is to assume that jurisdiction exists and proceed to determine whether the claim passes muster under Rule 12(b)(6). See Bell v. Hood, 327 U.S. 678, 682-83 (1946) ___ ____ ____ (where the merits of the action are intertwined with the issue of jurisdiction, the federal claim should be dismissed for lack of subject matter jurisdiction only if the claim is immaterial and made solely for the purpose of obtaining jurisdiction or if the claim is clearly frivolous or wholly insubstantial); Arroyo-Torres v. Ponce Fed. Bank, F.B.S., 918 _____________ _______________________ F.2d 276, 280 (1st Cir. 1990) (since plaintiff's assertion that federal law implied a private right of action was not frivolous, the district court had subject matter jurisdiction to determine whether or not a claim existed; therefore, the dismissal entered by the district court, ostensibly for lack of jurisdiction, should have been premised upon Rule 12(b)(6)); see also 2A James W. Moore et al., Moore's Federal ________ _______________ Practice 12.07[2.-1] (2nd ed. 1993). However, "we are not ________ bound by the label employed below," Carr v. Learner, 547 F.2d ____ _______ 135, 137 (1st Cir. 1976), and will treat the dismissal as one made pursuant to Rule 12(b)(6). -2- 2 The district court held that appellants failed to plead the "in connection with" requirement of a cause of action under Section 10(b)2 and Rule 10b-5,3 but rather alleged only a  ____________________ 2. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), states: It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . .  (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. 3. Rule 10b-5, 17 C.F.R. 240.10b-5 states: It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. -3- 3 case of breach of fiduciary duty and corporate mismanagement under Puerto Rico law. We reverse. I. FACTS. _____ The facts alleged in the complaint extending every reasonable inference in plaintiffs' favor, see Coyne v. ___ _____ City of Somerville, 972 F.2d 440, 443 (1st Cir. 1992) are __________________ as follows. CMT is a private, for-profit Puerto Rico corporation organized in 1978 to offer medical services in the eastern central region of Puerto Rico. Through its subsidiary, Turabo Medical Center Partnership,4 CMT owns and operates the Hospital Interamericano de Medicina Avanzada ("HIMA"), a hospital located in Caguas, Puerto Rico. The individual plaintiffs are the widow and children of Dr. Jaime Soler, one of CMT's founders, and Dr. Jos Badillo, the other founder of CMT. Prior to the disputed sale of securities described below, Dr. Badillo owned 217,500 shares of common voting stock of CMT, which constituted 16.81% of the total 1,293,942 shares of common voting stock of the company then issued and outstanding. In 1990, Dr. Soler passed away, leaving his 435,000 shares, which constituted 33.62% of CMT's common voting stock, to the Soler Estate. Appellants thus collectively owned 50.43% of CMT's common voting stock.  ____________________ 4. Not a party to this suit. -4- 4 Appellee Joaqu n Rodr guez was originally hired by Drs. Soler and Badillo to manage CMT and eventually became a minority shareholder as well as the chairman of its board of directors. The founders gave Rodr guez full administrative, financial, and operational control over all of the affairs of CMT. On November 14, 1991, Mrs. Soler replaced her deceased husband on the board. The other directors during the relevant periods were appellant Dr. Badillo and appellees Juan Chaves, Carlos M. Pi eiro, and Dr. Jos J. Vargas- Cordero. Rodr guez was CMT's president; Dr. Badillo its vice-president; Chaves its secretary; and Pi eiro its treasurer. Appellee Fernando E. Agrait was an attorney hired by Rodr guez to handle the in-house legal affairs of CMT. Appellee Luis Garc a Passalacqua was owner of Miramar Construction, Inc., which had a pending business deal with CMT. Appellees Chaves and Vargas-Cordero were also respectively the owner and dean of appellee Universidad de Ciencias M dicas San Juan Bautista, Inc. ("UCMSJB"), a non- profit company operating an independent school of medicine at HIMA. Appellees Rodr guez and Pi eiro were trustees of UCMSJB. UCMSJB operated its medical school from a space rented from CMT for $1.00 per year. Prior to the disputed sale, UCMSJB also owned 10,000 shares, or 0.77%, of CMT's common voting stock. -5- 5 In 1987, CMT's shareholders authorized the issuance of 300,000 common voting shares of CMT and the placement of those shares in a public sale at $10 per share, subject to registration under the Blue Sky laws of Puerto Rico, and for distribution solely to residents of Puerto Rico. This sale was not successful; very few of the shares were sold. Sometime between 1991 and the fall of 1993, Rodr guez told Dr. Ramon Carlos, a physician with privileges at HIMA who had approached him to purchase shares in CMT, that the public sale had been closed and that CMT's shares were no longer for sale.  During all of 1992 and until October 1993, shareholders meetings of CMT were not held, because, according to Rodr guez, the audited financial statements of the company were not ready. In 1993, Mrs. Soler and Dr. Badillo [the "plaintiff directors"] decided that outside experts should be hired to analyze CMT's future plans, and felt that no corporate assets should be conveyed or encumbered until this was done and the board was fully informed. Notwithstanding this decision, Rodriguez insisted upon the sale of surface rights over HIMA's parking facility to Miramar Construction for the development of a doctor's office building. Mrs. Soler opposed this sale at a meeting of CMT's board of directors held on September 9, 1993. At -6- 6 this same meeting, Rodriguez reiterated a prior request for approval of a three-year lease to UCMSJB of land managed and partly owned by CMT. Mrs. Soler and Dr. Badillo opposed the lease because of the nominal yearly rent of $1.00, because no independent evaluation of the best use of that land had ever been performed, and because no outside independent advice had ever been obtained as to the financial benefit to CMT of having UCMSJB's school of medicine, long unaccredited by the nationwide accrediting body, affiliated with CMT. The plaintiff directors also felt that the transaction between CMT and UCMSJB, which was effectively controlled by Chaves, Rodr guez, and Dr. Vargas, needed to be independently analyzed for conflicts of interest. Unbeknownst to the plaintiff directors, to the board of CMT, and to CMT as a corporate entity, Rodr guez and Chaves had designed a scheme to deprive plaintiffs of their historic majority ownership in the company and gain control of CMT for themselves. The scheme consisted of the issuance by Rodr guez and Chaves, on September 16, 1993, without prior knowledge or approval of the board of directors, of 200,000 shares of CMT stock to UCMSJB at a price of $10 per share, for a total price of $2,000,000. UCMSJB made a down payment of $500,000, and agreed to pay CMT the balance through eight promissory notes in the amount of $100,000 each, payable consecutively on August 1 and February 1 through February, -7- 7 1997, at 6% annual interest, and a promissory note in the amount of $700,000 on the same terms due on August 1, 1997.5 These notes were secured by an assignment of a contract between the Department of Health of the Commonwealth of Puerto Rico and UCMSJB by virtue of which UCMSJB was to receive monthly payments of $249,864.08. This collateral is alleged to have been "fictitious" because the contract in question was supposedly non-assignable under Puerto Rico law. The purposes of the scheme were allegedly to, a) secure control by Rodr guez and Chaves and approval of the lease with UCMSJB at CMT's expense, b) to procure and finance a substantial block of shares to UCMSJB at a wholly inadequate price and with fictitious collateral, c) to entrench management and validate sweetheart deals and/or situations of conflicts of interest, d) to dilute and eliminate plaintiffs' majority ownership in CMT, e) to evict plaintiffs from the corporate board, and f) to prevent the appointment of independent outside directors to the company board at the annual shareholders' meeting. At the next board meeting on September 29, 1993, Rodr guez again insisted that the three-year lease be approved at no charge, ostensibly in order to free up other space occupied by the medical school in the hospital. The plaintiff directors decided at this point firmly to oppose  ____________________ 5. The verified complaint states that the payments were to be made on a yearly basis for seven years. This is contradicted by the Agrait letter, infra and included in the _____ complaint. According to the letter, payment was to be as described above. -8- 8 the lease until independent analysis could be done. No mention was made at this meeting of the sale of shares to UCMSJB. In early October 1993, the plaintiff directors noticed that certain statements contained in the minutes of the September 29th meeting were inaccurate or misleading. Specifically, the minutes stated that Mrs. Soler had moved for approval of the minutes of the September 9th meeting, which she had not done; reflected a motion made by Mrs. Soler and Dr. Badillo setting forth certain requirements for consideration of the sale of surface rights to Miramar Construction, but omitted the principal requirement that such sale not be approved until it was independently determined that it was in CMT's best interest; and reflected that Dr. Badillo had proposed approval of the lease to UCMSJB, when both he and Mrs. Soler had strongly opposed such lease. The plaintiff directors decided that the only way to deal with the increasing conflicts of interest was to appoint to CMT's board reputable and experienced independent outside directors at the upcoming shareholders' meeting, to be held on October 28, 1993, and to do so in such a manner that these outside directors would hold a determinative vote in case of an impasse. Dr. Badillo also considered selling the plaintiff shareholders' majority block as a means of ending the tense situation, but the Soler Estate decided that -9- 9 until such time as outside directors were appointed, it would not consider or decide whether it wished to sell its shares in CMT. The plaintiff directors formalized their position in a letter dated October 7, 1993, a copy of which was hand- delivered to the directors of CMT at a board meeting held on that date. The letter stated their formal opposition, both as directors and as majority shareholders, to the approval of the lease with UCMSJB, complained of the absence of information concerning the transaction, and demanded that the board not approve the lease until such information had been received and analyzed. The board, controlled by Rodr guez, nonetheless approved the lease. Again, no mention was made of the sale of shares to UCMSJB. Following this meeting, the plaintiff directors commenced a search for qualified individuals with no financial ties to CMT who would agree to serve as outside directors. Between October 10 and October 28, 1993, two such individuals were located and agreed to serve. The plaintiff directors intended at the upcoming shareholders' meeting to vote for the reelection of Rodr guez, Pi eiro, Vargas- Cordero, and themselves, as well as the two new outside directors, and to retain Rodr guez as president and chief operating officer of CMT. It was their intention to inform Rodr guez of their plans on the night of the shareholders' -10- 10 meeting, prior to its commencement. However, when the plaintiff directors arrived at the meeting with their counsel and the outside directors, Rodr guez informed them that they no longer had a majority position in the company, by virtue of the sale of shares to UCMSJB.6 Upon learning of this sale, the plaintiff directors walked out of the shareholders' meeting. The meeting, allegedly in the absence of a quorum, then removed Mrs. Soler and Dr. Badillo as directors, and replaced them with Garc a Passalacqua. Rodr guez then informed the newly constituted board of the sale to UCMSJB, and the sale was ratified. Prior to the shareholders' meeting, Rodr guez had obtained a letter from CMT's inside counsel, Agrait, dated October 11, 1993 ("the Agrait letter"), to the effect that the proposed sale of stock to UCMSJB was legal. Plaintiffs contend that this letter was deliberately intended to conceal the illegality of the sale from other shareholders and directors. The letter first recited the details of the sale, as recounted above. It then stated that the sale was valid under the 1987 shareholders' resolution authorizing the issuance of 300,000 common voting shares of CMT. The letter concluded that since not all of the 300,000 shares had been  ____________________ 6. Following the sale to UCMSJB, there were 1,493,942 shares of CMT common voting stock outstanding. The plaintiffs' 652,500 shares represented 43.68% of the total; UCMSJB's 210,000 represented 14.06%, with the remaining 631,442 shares, or 42.27%, held by other shareholders.  -11- 11 sold, and since the sale to UCMSJB was a private sale to a single purchaser for part of the balance of the authorized but unsold shares, the sale had been implicitly authorized by the shareholders in 1987, and no public disclosure and registration under the Blue Sky laws were required because the sale was not part of an offering to more than ten purchasers. The complaint also notes that although the Agrait letter states that the sale was effected on September 16, 1993, Agrait wrote another letter on behalf of CMT to the Commissioner of Financial Institutions on September 27, 1993, inquiring whether a private sale of securities to a single entity was subject to the disclosure and registration requirements of Puerto Rico Blue Sky laws. The September 27 latter stated that CMT was "going to sell" 200,000 shares to one of its shareholders. The complaint also alleges that while $10 per share was an adequate price in 1987, when CMT was in dire financial straits and on the verge of bankruptcy, Rodr guez and Chaves knew that it was no longer an adequate price. In support of this allegation, the complaint states that Rodr guez had hired the services of Clark Melvin Securities and Merrill Lynch to conduct an appraisal in connection with the refinancing of CMT's debt, which was expected to close shortly. On the day of the shareholders' meeting, Rodr guez -12- 12 and Chaves were told by a Mr. Montilla, pursuant to that appraisal, that the market value of all of CMT's common voting shares upon approval of the financing would be approximately $24 million, or at least $18 per share (not counting the 200,000 shares sold to UCMSJB). Finally, the complaint states that on November 3, 1993, the plaintiffs sent a formal demand letter to CMT's management and "the illegally appointed directors," advising them that any actions taken by the new board after October 28, 1993 were invalid and illegal and demanding various remedial actions including the convening of an extraordinary shareholders' meeting. After various negotiated delays, the defendants responded that under no circumstances would plaintiffs be reinstated to the board, and offered to buy plaintiffs' shares at approximately $5 per share. They also rejected plaintiffs' demand for an extraordinary shareholders meeting, notwithstanding the requirement in Article IV, Section 2 of the company by-laws that such meetings "shall be called by the president" at the request of the holders of more than 25% of the outstanding voting stock. II. THIS LAWSUIT. ____________ Plaintiffs' complaint alleged, on behalf of CMT, a violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b) and Rule 10b-5 of the Securities Exchange Commission, 17 C.F.R. 240.10b-5. The complaint -13- 13 also sought, under the district court's supplemental jurisdiction, see 28 U.S.C. 1367, rescission of the stock ___ purchase agreement for lack of corporate authority and lack of proper consideration, annulment of the October 28, 1993 board election, and a new election under Puerto Rico law. The complaint was filed on November 24, 1993, and included requests for preliminary and permanent injunctions and for a temporary restraining order prohibiting any extraordinary disbursement of corporate funds, sale or encumbrance of corporate assets, and the holding of board of directors meetings during the next ten days. The district court issued the temporary restraining order on the same day the complaint was filed and set a hearing on the preliminary injunction for December 3, 1993. At a status conference held on December 2, 1993, the district court consolidated consideration of the preliminary and permanent injunctions, and set a trial date of February 7, 1994. The temporary restraining order lapsed by its own terms on December 3, 1993. CMT then filed a motion requesting realignment as a defendant, and for dismissal or summary judgment. UCMSJB moved to joint CMT's motion for dismissal or summary judgment. Agrait filed a motion for summary judgment. The remaining defendants filed a motion to dismiss. The district court, in an opinion and order filed on February 7, 1994, decided the motions based on the pleadings only, treating all -14- 14 motions as motions to dismiss under Fed. R. Civ. P. 12(b)(6). Finding that the alleged securities fraud did not make out a claim under 10(b) of the Securities Exchange Act of 1934, the district court dismissed the federal securities fraud claim for failure to state a claim under Rule 12(b)(6).7 Because federal jurisdiction was based solely on that claim, the court declined to retain jurisdiction over the remaining state law claims, and dismissed them without prejudice. The plaintiffs filed a motion for reconsideration on February 21, 1994. The district court denied the motion in a written order dated March 24, 1994. This appeal followed. III. THE DISTRICT COURT'S DECISION. _____________________________ The district court characterized the case as presenting the question whether a corporation can be said to have been deceived in connection with the sale of its securities within the meaning of section 10(b) of the Securities Exchange Act of 1934, when the president and the secretary authorized the sale of allegedly previously-issued stock to a shareholder, without approval of the board of directors or the other shareholders. Estate of Soler, 847 F. Supp. at 238. The court said that _______________ the "in connection with" element requires a showing "that the wrongful conduct caused the plaintiff to engage in the  ____________________ 7. See supra n.1. ___ _____ -15- 15 disputed sale or purchase of securities and that the plaintiff's injuries are directly attributable to the deception and to the resulting transaction." Id. at 239 ___ (citing Wilson v. Ruffa & Hanover, P.C., 844 F.2d 81, 85 (2d ______ _____________________ Cir. 1988)). If the alleged fraud does not relate to "the inherent nature, characteristics or value of the security and, therefore, could not have influenced the plaintiff in a decision to sell or purchase the security," id. at 240, there ___ is no causal link to the disputed sale. The court then said that the alleged omission in this case was the failure of the defendants to reveal, in advance, the sale of the stock of CMT to UCMSJB. Where a corporation is fraudulently induced into issuing its own securities for less than their fair value because of the misappropriation of inside information regarding the stock, the corporation itself is injured and a shareholder derivative action is appropriate. Frankel v. Slotkin, 984 _______ _______ F.2d 1328, 1334 (2d Cir. 1993). However, the sale in this case did not take place because the corporation was uninformed about the nature of the stock, or because defendants misappropriated inside information about the value of the securities to be sold. We cannot find that the concealment of the sale itself from the corporation caused the corporation to enter into the sale. Rather than "in connection with" the sale of a security, the deception here was "of" the sale of a security. Id. (footnote omitted). The district court noted the ___ incongruity of suggesting "that disclosure of a sale without -16- 16 full disclosure of some material aspect of the sale would be a violation of 10b-5, while failing to disclose the sale at all is not violation." Id. at 241. However, the court ___ concluded, Rule 10b-5 is not meant to address instances of corporate mismanagement. "Rather, it was intended to promote full and fair disclosure to those who buy or sell securities in order to ensure that investors are able to make the correct decision as to whether to carry out the purchase or sale." Id. (citing Santa Fe Indus., Inc. v. Green, 430 U.S. ___ _____________________ _____ 462, 477-78 (1977); O'Brien v. Continental Ill. Nat. Bank & _______ _____________________________ Trust Co.,593 F.2d54, 60(7th Cir.1979)). The courtthen noted, _________ While we recognize that the failure to reveal the sale at all necessarily meant that information about the nature of the shares was also concealed, because the company did not "know" that it was selling any securities, the corporate entity cannot be said to have been deceived as to the characteristics or value of the securities, or to have made any decisions based on a lack of knowledge about the nature of the securities. Id. The court then exercised its discretion to dismiss ___ without prejudice the remaining supplemental state law claims. On reconsideration, the district court first noted, in response to the argument that it had applied an incorrect subjective test of causality, that it had not held that CMT had not relied on the omitted information, but rather that the omission was not of the type Rule 10b-5 was meant to -17- 17 remedy. Id. The court then discussed plaintiffs' argument ___ that it had applied a test of awareness of an investment decision applicable to transactions between individuals and entities, not to transactions in which a corporation is deceived by its own management. The court noted that Goldberg v. Meridor, 567 F.2d 209 (2d Cir. 1977), cert. ________ _______ _____ denied, 434 U.S. 1069 (1978) and its progeny recognize that ______ even though some controlling directors or shareholders have complete information, they can conceal that information and utilize it to the detriment of the corporation, thus deceiving the corporate entity in violation of Rule 10b-5. We agree that in the case before us, taking the facts as alleged by plaintiffs, the corporation was deceived when some members of the board of directors conducted a sale of corporate stock without informing the full board and the remaining shareholders. Id. at 242. Nevertheless, the court reiterated its holding ___ that the deception here was not in connection with the sale of securities as required for liability under Rule 10b-5. Id. The court distinguished Goldberg, saying, ___ ________ In Goldberg, the minority shareholders ________ knew that the disputed transaction was to take place, but they were deceived into forgoing a possible state injunction because pertinent facts about the transaction were not revealed by defendants. Therefore, a decision by the minority shareholders not to seek a state injunction was completed without the benefit of complete information. Here, because the minority shareholders had no knowledge that the transaction was taking place, there was no decision-making process of either type. -18- 18 Id. (citation and footnote omitted). ___ The court also addressed plaintiffs' argument that the transaction found actionable under Rule 10b-5 in Superintendent of Ins. v. Bankers Life & Casualty Co., 404 _______________________ _____________________________ U.S. 6 (1971), involved a deception unrelated to the inherent nature, characteristics or value of the security. The court in effect conceded that this was so, saying that in Bankers _______ Life, ____ [t]he deception related to the nature of the transaction -- that the plaintiff would be paying for its own securities -- and not to the existence of the transactions. We were not intending to create a hard and fast rule as to what should be deemed "in connection with" a securities transaction, but merely to point to illustrative cases in order to demonstrate why the instant action falls outside the purview of Rule 10b-5. Estate of Soler, 847 F. Supp. at 242 (citation omitted). ________________ Finally, the court compared this case with Ketchum v. Green, _______ _____ 557 F.2d 1022 (3d Cir. 1977), cert. denied, 434 U.S. 940 _____________ (1977). In that case, a secret scheme was hatched to oust certain employees/shareholders, which had the additional result of forcing them to sell their shares back to the corporation. The court interpreted the Third Circuit as holding "that the disputed transaction was not actionable under Rule 10b-5 because it occurred in connection with a struggle for control of the corporation, rather than in connection with the sale of securities." Id. at 243. The ___ -19- 19 court concluded that the present case similarly involved a dispute over control of CMT, and thus belonged in state court. Id. ___ IV. A. The Standard of Appellate Review.8 For purposes of Fed. R. Civ. P. 12(b)(6), a court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the non-movant. Washington Legal _________________ Found. v. Massachusetts Bar Found., 993 F.2d 962, 971 (1st ______ _________________________ Cir. 1993) (citing Coyne, 972 F.2d at 442-43). "A court may _____ dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, ______ _______________  ____________________ 8. The district court ruled that plaintiffs lacked standing to maintain a private action in their individual behalves for securities fraud under Rule 10b-5, because they did not purchase or sell the securities involved in the disputed transaction, citing Blue Chip Stamps v. Manor Drug Stores, _________________ __________________ 421 U.S. 723 (1975), reh'g denied, 423 U.S. 884 (1975). The ____________ plaintiffs have not appealed from this decision. The district court held, however, that the plaintiffs had standing to bring a derivative action on behalf of CMT. Appellees challenge this ruling on the ground that an "action that is not for the benefit of the corporation, but merely seeks to enforce the rights of one or more shareholders is not a derivative action." But as we discuss, infra, the _____ verified complaint adequately alleges injury to the corporation, stating that certain of its board members caused it to sell its own stock, without disclosure of the transaction to other, disinterested board members, hence without disclosure to all those charged by law to act on behalf of the corporation, at a price far below the stock's actual value, with partial payment secured by fictitious collateral. That the plaintiffs may also have been injured in a personal capacity is irrelevant to the question of their standing to bring a derivative suit for the corporation. -20- 20 467 U.S. 69, 73 (1984) (citing Conley v. Gibson, 355 U.S. 41, ______ ______ 45-46 (1957)). An appellate court is not limited to the legal grounds relied upon by the district court, but may affirm on any independently sufficient grounds. Willhauck v. _________ Halpin, 953 F.2d 689, 704 (1st Cir. 1991). ______ B. Fraud Upon a Corporation by its Directors. "To prevail under Rule 10b-5, 'a plaintiff must prove, in connection with the purchase or sale of a security, that the defendant, with scienter, falsely represented or __ omitted to disclose a material fact upon which the plaintiff ____________________ justifiably relied.'" Willco Kuwait (Trading) S.A.K. v. ________________________________ deSavary, 843 F.2d 618, 623 (1st Cir. 1988) (quoting Kennedy ________ _______ v. Josephthal & Co., Inc., 814 F.2d 798, 804 (1st Cir. 1987)) ______________________ (emphasis supplied). "The Act protects corporations as well as individuals who are sellers of a security." Bankers Life, ____________ 404 U.S. at 10. We hold that the district court erred in ruling that the verified complaint did not state a claim for CMT under 10(b) and Rule 10b-5. Briefly recounted, the scheme described in the complaint was allegedly hatched by CMT's president and by its secretary, both of whom were also its directors. The scheme was to cause CMT to issue and sell 200,000 shares of earlier authorized common voting stock9 to UCMSJB a medical  ____________________ 9. The issuance of 300,000 shares of new stock had been authorized by the shareholders in 1987, six years earlier, at a price of $10 a share, when CMT was allegedly close to -21- 21 school of which CMT's president was a trustee, and of which CMT's secretary was the owner for the price of $10 a share. The issuance and sale of stock was allegedly accomplished without the knowledge or approval of the plaintiff directors, of the board of directors, and of the corporate entity itself. UCMSJB paid CMT for the stock largely in notes secured by an assignment of a contract between the Department of Health of Puerto Rico and UCMSJB. Two of CMT's other directors were at the time closely affiliated with UCMSJB, while the two plaintiff directors  who between them controlled a bare majority of CMT's stock  were unhappy with CMT's developing relationship with UCMSJB. As a result of the deliberately concealed sale, the proportion of CMT stock controlled by the plaintiff directors fell below 50%, leaving UCMSJB and those associated with it in practical control of CMT. The complaint alleged that an objective of selling the 200,000 shares of CMT stock to UCMSJB was to enable the latter to obtain a substantial block of CMT shares at a wholly inadequate price and to finance the stock purchase with fictitious collateral. According to the complaint, the appraised market value of CMT's stock when sold to UCMSJB in 1993 was $18, not $10, a share; and the government contract constituting collateral for the notes was  ____________________ bankruptcy. Efforts to sell the shares at that time were unavailing and, it might be inferred, were abandoned. -22- 22 non-assignable, rendering the collateral fictitious. The complaint further alleged that, although the stock was issued to UCMSJB on September 16, 1993, no mention was made of the fact at the two board of director meetings held in September one held before and one after the 16th. By the time of the October shareholders' meeting, defendants now firmly in control revealed the stock transaction for the first time to the plaintiff directors and former majority shareholders. Plaintiffs were then ousted as directors. It is by now well established that a corporation has a claim under 10(b) if the corporation was defrauded in respect to the sale of its own securities by some or even all of its directors. See, e.g., Goldberg, 567 F.2d at 215. In _________ ________ Ruckle v. Roto Am. Corp., 339 F.2d 24 (2d Cir. 1964), a case ______ _______________ factually close to the present, a director who represented more than half the stock entitled to vote at the 1964 annual meeting of the defendant corporation successfully brought a derivative action against his six fellow directors, who also constituted the corporation's officers. The complaint alleged that the officers had sought to perpetuate their control by, among other ways, having the board approve the issuance of some 75,000 treasury shares that were to be resold to the president or voted as he directed. The plaintiff alleged that the defendants had withheld the latest financial statements from the board, had arbitrarily ascribed -23- 23 a $3 value to the shares, and had approved several transactions involving the stock without disclosing pertinent facts to the entire board. Id. at 26. Reversing a ___ dismissal, the Second Circuit held that it was possible under Rule 10b-5 for a corporation to be defrauded by a majority of its directors "or even the entire board." Id. at 29. The ___ court went on to say, If, in this case, the board defrauded the corporation into issuing shares either to its members or others, we can think of no reason to say that redress under Rule 10B-5 [sic] is precluded, though it would have been available had anyone else committed the fraud. There can be no more effective way to emasculate the policies of the federal securities law than to deny relief solely because a fraud was committed by a director rather than an outsider. Denial of relief on this basis would surely undercut the congressional determination to prevent the public distribution of worthless securities. Id. ___ While Ruckle predated the Supreme Court's decision ______ in Santa Fe, nothing in Santa Fe and its progeny invalidate ________ ________ Ruckle's relevant holding. See, e.g., Frankel, 984 F.2d at ______ __________ _______ 1334 (citing Ruckle with approval); see also O'Neill v. ______ _________ _______ Maytag, 339 F.2d 764 (2d Cir. 1964); Schoenbaum v. ______ __________ Firstbrook, 405 F.2d 215 (2d Cir. 1968) (en banc), cert. __________ _____ denied sub nom. Manley v. Schoenbaum, 395 U.S. 906 (1969); ________________ ______ __________ Santa Fe, 430 U.S. at 462; Goldberg, 567 F.2d at 209; see ________ ________ ___ -24- 24 also 7 Louis Loss & Joel Seligman, Securities Regulation ____ ______________________ 3530-41 (3rd ed. 1991) (discussing this line of cases). As in Bankers Life, it is here alleged that the _____________ corporation on behalf of which suit has been brought was "injured as an investor through a deceptive device which deprived it of [adequate] compensation for the sale of its valuable block of securities." 404 U.S. at 10. The deceptive device was that interested directors of CMT and other parties deliberately omitted to inform CMT's disinterested directors and shareholders, at a time when they might still have acted to protect CMT, of an impending, allegedly deleterious, sale of stock to UCMSJB. CMT "relied upon" this omission to its detriment, in that its managers issued and sold its stock at an allegedly inadequate price and without adequate security, CMT having been fraudulently deprived of the judgment of its full board of directors on the matter and, in particular, of the judgment of those directors and stockholders who were disinterested and not personally connected with UCMSJB. Such facts plainly make out a claim of defendants' knowing deception of and injury to CMT in connection with the sale of its stock. The district court recognized that, "in the case before us, taking the facts as alleged by plaintiffs, the corporation was deceived when some members of the board of directors conducted a sale of corporate stock without -25- 25 informing the full board and the remaining shareholders." Estate of Soler, 847 F. Supp. at 242. The court even _________________ acknowledged that a 10(b) violation would have occurred had the directors been told of the proposed sale of stock but deceived as to related material facts. The court believed, however, that no violation occurred here, because the sale itself was concealed, resulting, it said, in no decision- making process at all. We do not see the distinction. The calculated concealment of the sale itself, thus depriving CMT's disinterested directors of the opportunity to take steps to prevent it before it occurred, was an omission to provide essential material information to the company regarding the stock sale. Indeed, accepting the allegations of the complaint as true, it is a reasonable inference that concealment of the proposed sale from CMT's board of directors was essential to the success of the fraud, since the plaintiff directors controlled a majority of CMT's outstanding shares and would doubtless have acted to block the sale had they known. We see no merit in the district court's analogy between this case and Santa Fe. In Santa Fe, acting without ________ ________ fraud or concealment, a controlling company utilized Delaware's "short form merger" statute to force minority stockholders in a subsidiary to sell back their shares. The latter sued under 10(b) asserting a breach of fiduciary -26- 26 duty. Noting the absence of a "manipulative or deceptive device," the Supreme Court held that 10(b) is not meant to remedy corporate mismanagement, but rather to promote full disclosure to those who buy or sell securities. The Court in Santa Fe nowhere suggested that a deliberate stock fraud, ________ involving the calculated omission by personally interested directors to tell other directors that the company was selling its treasury stock at a below market price and without adequate security, was beyond the reach of 10(b). The allegations here are precisely of a lack of full disclosure to CMT, the seller of the securities. They go beyond mismanagement to the calculated and deliberate concealment, by interested directors, of information that a substantial block of the company's stock was being sold at an improperly low price to another company with whom the interested directors were linked. The sale of CMT's securities, and the price and terms of the sale, were deliberately withheld to prevent the disinterested members of CMT's board of directors, who were also its controlling shareholders, from taking action prior to the completed sale. Hence those sharing in the legal responsibility to manage CMT's affairs were kept in the dark until the time had passed when they might still have acted to safeguard CMT's interests. As there was no "full and fair disclosure" to those legally empowered to act for the corporation, there was -27- 27 no full and fair disclosure to CMT itself. Unlike the situation in Santa Fe, the facts alleged go well beyond mere ________ corporate mismanagement "in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary." 430 U.S. at 477.  Appellees contend that the verified complaint alleges no more than violations of state law, such as breach of fiduciary duty, and that therefore this case falls into the "exception" to 10(b) liability created by Bankers Life. ____________ We do not agree. That state causes of action are also available to the plaintiff does not mean that a right of action will not lie under 10(b). "Section 10(b) must be read flexibly, not technically and restrictively. Since there was a 'sale' of a security and since fraud was used 'in connection with' it, there is redress under 10(b), whatever might be available as a remedy under state law." Bankers _______ Life, 404 U.S. at 12. The statement in that case that ____ "[C]ongress by 10(b) did not seek to regulate transactions which constitute no more than internal corporate _________________ mismanagement," id. (emphasis added), means only that a ___ breach of fiduciary duty, "without any deception, misrepresentation, or nondisclosure," Santa Fe, 430 U.S. at ________ 476, does not violate 10(b). Where corporate fiduciaries deceive other board members and stockholders by withholding key information pertinent to the corporation's sale of its -28- 28 own securities, the corporation may have redress through  10(b). In dismissing the corporation's 10(b) claim, the district court also held that the defendants' alleged deception here was not sufficiently linked causally to a sale of securities. The court cited to cases where the misrepresentations or omissions "did not relate to the inherent nature, characteristics or value of the security." See, e.g., Chemical Bank v. Arthur Anderson & Co., 726 F.2d _________ ______________ ______________________ 930 (2d Cir.), cert. denied, 469 U.S. 884 (1984). From ____________ these, the court reasoned that simply omitting to tell CMT's directors and majority shareholders of the fact of the sale of CMT's authorized stock was different from feeding them false information about the specifics of the sale. In so reasoning, the court sought to distinguish cases such as Bankers Life, 404 U.S. at 6, Goldberg, 567 F.2d at 209, 219- ____________ ________ 20, and Frankel v. Slotkin, 984 F.2d 1328 (2d Cir. 1993). _______ _______ The short answer, we think, is that these cases cannot be distinguished. The district court asserts that "the sale in this case did not take place because the corporation was uninformed about the nature of the stock." Estate of Soler, _______________ 847 F. Supp. at 240. Yet the complaint alleges that an appraisal of the stock indicated that it was worth $18, not $10, a share. Had the board of directors been so advised, and had it been told of other aspects of the sale (such as -29- 29 the alleged fictitious security), it might not have agreed to the sale, and, in any case, the minority directors (who were majority shareholders) might have been able to take action to block the sale. Nor do we agree that this case is controlled by Ketchum v. Green, 557 F.2d 1022 (3d Cir. 1977). In that _______ _____ case, the Third Circuit wrote: Upon review of the stipulation of facts and the record of the proceedings before the district court, it becomes clear that the case at hand involved little more than allegations pertaining to an internal corporate conflict. Although the complaint seemingly stresses the importance of the relinquishment of plaintiffs' shares under the stock retirement plan, the factual stipulation and other segments of the record are largely silent on this point. For example, it is only in the concluding paragraphs of the stipulation that there is any mention of the forced sale of securities. It thus is manifest that the essence of the plaintiffs' claim concerns their dismissal as officers of Babb, Inc. 557 F.2d at 1027 (footnote omitted). The alleged fraud in Ketchum was defendants' _______ failure to reveal their intentions to oppose the reelection of the plaintiffs as officers. While termination of plaintiffs as corporate employees would trigger a by-law forcing them to sell their stock, the Third Circuit concluded that 10(b) did not apply as the essence of the relief sought was directed against termination of plaintiffs as officers, not to the sale of securities. In contrast with -30- 30 Ketchum, the stock sale to UCMSJB is central to the fraud _______ detailed in the complaint here. We see no basis in Ketchum _______ from which to hold that the present scheme was not "in connection with" the sale of a security, as Rule 10b-5 requires. We have considered appellees' other arguments, including those related to the adequacy of the complaint under Fed. R. Civ. P. 9(b), and find them to be without merit. We hold that the complaint in this case, viewed in a light most favorable to the plaintiffs, states a cause of action under 10(b) and Rule 10b-5. Of course, nothing we say is meant to relieve appellants of their burden of proof as to the matters alleged in the complaint, nor to suggest that we accept those matters as necessarily being complete or true.10  ____________________ 10. Appellees Agrait, Pi eiro, and Vargas-Cordero argue that the verified complaint alleges only that they aided and abetted the sale of stock to UCMSJB. They cite Central Bank ____________ v. First Interstate Bank, 114 S. Ct. 1439 (1994) (issued ______________________ during the pendency of this appeal), which held that a private plaintiff could not maintain an aiding and abetting suit under 10(b) and Rule 10b-5. Appellee UCMSJB argues that it was under no duty to inform the appellants of its purchase of CMT's stock, citing Chiarella v. United States, _________ _____________ 445 U.S. 222, 234-35 (1980) ("Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud. When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."), and Taylor v. First Union Corp., 857 F.2d 240 (4th ______ __________________ Cir. 1988). Because we now reverse the district court's judgment dismissing appellants' complaint, we think these issues are best left in the first instance to the district court. -31- 31 C. Conclusion. We reverse the district court's judgment dismissing the complaint in this case for failure to state a claim upon which relief may be granted, and remand for further proceedings consistent with this opinion. Reversed and remanded. _____________________ -32- 32